1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   --------------------------------x
                                        04-CR-874(BMC)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  February 20, 2020
                                        10:30 a.m.
6   TIRSO MARTINEZ-SANCHEZ,

7            Defendant.

8   --------------------------------x

9          TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
              BEFORE THE HONORABLE BRIAN M. COGAN
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  MICHAEL ROBOTTI, AUSA

15

16  For the Defendant:         QUIJANO & ENNIS
                               40 Fulton Street, 23rd Floor
17                             New York, New York 10038
                               BY:  PETER E. QUIJANO, ESQ.
18                                  NANCY ENNIS, ESQ.

19

20  Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
                               Phone:  (718)804-2777
21                             Fax:    (718)804-2795
                               Email:  Georgetteb25@gmail.com

22

23

24  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
25

```
1              THE COURTROOM DEPUTY:  All rise.

2              THE COURT:  Good morning.  Have a seat please.

3              THE COURTROOM DEPUTY:  Criminal cause for

4    sentencing.  U.S.A. V. Martinez-Sanchez.  Docket number

5    04-CR-874.

6              Counsel, please state your appearances starting with

7    the government.

8              MR. ROBOTTI:  Good morning, Your Honor.  Michael

9    Robotti for the United States.  With me is Shayna Bryant from

10   the U.S. Probation Department.

11             THE PROBATION OFFICER:  Good morning.

12             THE COURT:  Good morning.

13             MR. QUIJANO:  Good morning, Judge Cogan for Tino

14   Martinez, Peter E. Quijano, Nancy Ennis.  Also seated at

15   counsel table is Jose Antonio de Alba, Mr. Martinez's Mexican

16   attorney.  Mr. Martinez is present and we're ready to proceed.

17             THE COURT:  All right.  Good morning, all.  Good

18   morning, Mr. Martinez.

19             What are we doing about an interpreter?

20             THE COURTROOM DEPUTY:  We have an interpreter

21   previously sworn.

22             THE COURT:  We have a Spanish interpreter previously

23   sworn.  I'll note that Mr. Martinez is wearing headphones as

24   is his counsel so they can follow the proceedings.  Okay.

25             MR. QUIJANO:  If Your Honor, please, I also
```

1     neglected to mention one other thing, the Court should be

2     aware also present for Mr. Martinez's sentencing are his wife,

3     a brother, two sisters, a son, a niece and two close family

4     friends.

5                 THE COURT:  Okay.  Their presence is noted and

6     appreciated.

7                 Let me first determine if I'm going to accept the

8     guilty plea.  I don't think it's been previously accepted that

9     was given to Magistrate Judge Pohorelsky back in 2016; is that

10    right?

11                MR. ROBOTTI:  I think that's accurate, Your Honor.

12                THE COURT:  All right.  I have reviewed the

13    transcript of those proceedings.  Let me ask Mr. Martinez, is

14    it still your desire, sir, to plead guilty?

15                THE DEFENDANT:  Yes.

16                THE COURT:  Is everything that you told the

17    magistrate judge back in 2016 true?

18                THE DEFENDANT:  Yes.

19                THE COURT:  Mr. Quijano, do you know of any reason

20    why I should not accept the guilty plea?

21                MR. QUIJANO:  No, Your Honor.

22                THE COURT:  Having reviewed the transcript and heard

23    counsel and the defendant's answers to my questions, I find

24    that the defendant is acting voluntarily, that he understands

25    his rights and the consequences of his plea and that there is

1    a factual basis for the plea.  I, therefore, accept the plea

2    of guilty as stated to the magistrate judge in 2016.

3            Let me now review with Mr. Martinez and the parties

4    the documents that I have reviewed in preparing for the

5    sentencing.  If any of these documents are not familiar to

6    you, Mr. Martinez, just let me know and we'll take a break so

7    that you can review them with your attorneys.

8            We start out with the Presentence Investigation

9    Report of February 4th, 2020.  There is an addendum to that

10   report that's dated February 13th, 2020.  I then have a

11   sentencing memorandum from Mr. Quijano dated February 13th,

12   2020, and I have a sentencing memorandum from the government

13   with the transcript of the Guzman trial annexed and that is

14   dated February 13th, 2020.

15           Now, in addition to those things, I was given by

16   probation a confidential memorandum that, for the most part, I

17   think for the entire part, simply gives some pedigree

18   information about the defendant that's not included in the

19   Presentence Investigation Report.  I want to make sure that

20   the government and defense counsel have had a chance to see

21   that confidential memorandum.

22           MR. QUIJANO:  We have, Your Honor.

23           MR. ROBOTTI:  Yes, Your Honor.

24           THE COURT:  But I don't want you keeping copies.  So

25   if you've got copies, can you give them back to my deputy

1     please.

2              MR. QUIJANO:  Of course.

3              THE COURT:  Let's next turn to the sentencing

4     guidelines, which of course are merely advisory and just one

5     factor that I'm going to consider in determining the

6     appropriate sentence.  I don't think there's any dispute that

7     we're talking about an offense level of 43, a Criminal History

8     Category of I, and that gives us a guideline range of

9     recommending life in prison.  Is that correct?

10             MR. ROBOTTI:  Your Honor, just I think a

11    mathematical correction on the addendum to the PSR.

12             THE COURT:  Okay.

13             MR. ROBOTTI:  So when you total up the base offense

14    level in paragraph 10 and the specific offense characteristics

15    in paragraphs 11 through 15 --

16             THE COURT:  Right.

17             MR. ROBOTTI:  -- and then add the adjustment for the

18    role in the offense, the adjusted offense level in

19    paragraph 19 should in fact be 49 instead of 46, and then

20    minus three points for acceptance of responsibility would

21    yield a total offense level of 46.  It doesn't affect the

22    guidelines range which is life, but we just wanted to note

23    those corrections for the record.

24             THE COURT:  That was just a counting error?

25             MR. ROBOTTI:  Just a counting error.

1          THE COURT:  Mr. Quijano, you agree?

2          MR. QUIJANO:  We agree, Your Honor.

3          THE COURT:  It doesn't change the guideline range of

4    life obviously, it only raises the point level higher but I'll

5    make that correction to the addendum.  That's my finding on

6    the guidelines.

7          Let me then hear from the parties as to the

8    application of all of the sentencing factors.  I will start

9    with you, Mr. Quijano, and I have to tell you, I don't think I

10   can get where you want me to go.  I know you're looking for a

11   time served sentence, you've advocated for it very effectively

12   but there's so much drugs here that, you know, even if -- if

13   there were not the 5K1 information then I think there's no way

14   we wouldn't be looking at life imprisonment.  And when I start

15   there not -- forgetting about the guidelines just that's where

16   we would be because that would be an appropriate sentence

17   without cooperation, I can't get all the way down from life to

18   what you've asked for time served, which is essentially, I

19   think it's five or six years, and I'll find out from probation

20   if he's going to get credit for the time he spent in custody

21   prior to extradition, which I think he should, and if he's not

22   going to get it from the BOP, he'll get it from me.  But I'm

23   still -- I'm having a very hard time with this conduct and his

24   position in the organization getting all the way down to time

25   served, so take your best shot, I'm certainly open to being

1  persuaded.

2          MR. QUIJANO:  Of course, Your Honor.  Your Honor,

3  certainly I would agree with the Court that there is, quote,

4  so much drugs, but I would first submit, Your Honor, there's

5  also extraordinary mitigation as well as other compelling

6  factors that do warrant the sentence we're requesting.

7          Let me start with the cooperation aspect.

8  Mr. Martinez's cooperation, by any measure, is truly

9  extraordinary and extensive.  Indeed, when measured against

10  the factors, the five factors outlined in the 5K1.1, the only

11  inescapable conclusion, Your Honor, I insist is a sentence of

12  time served.

13          Starting with timeliness.  While he was detained

14  awaiting extradition for two years in Mexico is when I first

15  met Mr. Martinez.  After our first meeting, he asked that I

16  contact the government here in Brooklyn, advise them that not

17  only was he willing to plead guilty but was willing to provide

18  total and complete cooperation.  Asked me at that early stage

19  to provide the government with essentially an outline, if you

20  will, of the vast amount of information he knew about various

21  cartels and their leaders and of course his own conduct, which

22  we did.

23          He provided information at that point, as it

24  continued for the next four years, of the Sineloa cartel's

25  trafficking and in particular the cartel's leaders, Guzman

1    Loera, Ismael Zambada, El Mayo, as well as the Juarez cartel

2    and its leaders, Armando Carrillo and his brother Vincente

3    Carrillo.  Within weeks of his arrival in December of 2015

4    here in Brooklyn, he began to meet with the government.  The

5    nature and extent of his actual assistance is simply

6    remarkable.  His role in the cartel's operation, as the Court

7    is fully aware from hearing his testimony and reading the

8    various submissions, was essentially that of a director of

9    transportation, if you will.  I will characterize it like

10   that.

11           He was in charge of developing and overseeing this

12   vast network of railroads used to move the cocaine from Mexico

13   and throughout the United States.  He designed the cars that

14   were used to ship them, the routes.  He found the warehouses

15   in various locations in the United States, here in New York

16   and the New York area, Chicago, Los Angeles and various other

17   parts.  It all flowed because of him and he's completely

18   acknowledged that.  From that position of course he was

19   witness to so much of how this cartel worked and operated.

20           After meeting with the government for over three

21   years, he was critical obviously in the Guzman Loera's jury

22   trial, which of course resulted in a conviction.  Of course

23   Your Honor heard all of that firsthand.

24           In addition to his use in that prosecution and

25   conviction, he had this incredible encyclopedia of knowledge

1    which was used in preparing affidavits in support of the

2    government's extradition for Guzman.  This information was

3    also used in securing an indictment of Vincente Carrillo, the

4    leader of the Juarez cartel for a continuing criminal

5    enterprise.  He signed affidavits used in the extradition of

6    these two people and that is very significant, not just for

7    its value in terms of cooperation but significant in terms of

8    what this man did.

9          In addition, two months ago, in December of 2019,

10    the government relied on Mr. Martinez's information regarding

11    another individual who was detained in Mexico, a former

12    government official and is obviously contributing to that

13    investigation and that prosecution.  He's already assured the

14    government that after his sentencing he will remain available

15    and ready to continue his cooperation and if need be, testify

16    in the prosecution of that individual.

17          The next two 5K factors are truthfulness,

18    completeness, reliability of the information provided by

19    Mr. Martinez and the danger or risk of injury.  Of course,

20    there are very few circumstances I would submit that better

21    support a conclusion that the information was complete,

22    reliable and completely truthful and to be used by the

23    government, by the United States at a trial before a court,

24    before this Court, as well as using this information for the

25    purposes of extraditing other individuals, especially

1   individuals of the level of Guzman Loera and Carrillo Fuentes.

2   These affidavits were served on the Mexican government and I

3   need to touch on the significance of that.  They are submitted

4   anonymously.  Martinez's signature was nowhere to be found.

5   However, under Mexican procedure, these affidavits were

6   routinely provided to the attorneys and the defendants, the

7   would-be defendants incarcerated in Mexico.  Within a very

8   short period of time, I know that those affidavits were then

9   circulated throughout various cartels.  There was no doubt by

10  anyone in Mexico who read those affidavits as to who the

11  author of that information was.  No doubt whatsoever.  No one

12  would have this kind of detail other than Mr. Martinez.  It is

13  beyond understatement that Mr. Martinez's cooperation put his

14  safety and life as well as the safety of his entire family at

15  risk.  Various measures were taken before those affidavits

16  were signed, measures that still continue to this day to

17  protect them.  I know this Court does not need me to describe

18  or stress the danger of this kind of information in the hands

19  of some people in Mexico.  This Court heard testimony of

20  murders and violence against not just possible cooperators,

21  entire families, children, innocents.  Mr. Martinez did this

22  and the entire cooperation fully aware of that.  His family

23  has had to undergo major changes because of that.  That's the

24  significance and measure of this cooperation.

25          The final factor is the usefulness and significance

1   of Tirso Martinez's assistance.  I can do no better than

2   perhaps paraphrase some of the government's submission.  Tirso

3   Martinez's cooperation has been extremely meaningful.  Indeed,

4   it was essential to the government's ability to prosecute some

5   of the most powerful drug trafficking leaders in the world.

6   The beneficial impact of his candid, complete and crucial

7   cooperation on the larger community not only New York but well

8   beyond is of historic value.  Clearly, his unswerving efforts

9   to assist law enforcement authorities in dismantling the

10  Sineloa and Juarez drug cartels should entitle him to

11  significant sentencing reduction.

12          Now, let me address specifically the Court's

13  hesitation at this point to believe that when weighed against

14  all this incredible drugs and yes, his position and role in

15  the cartel, at the end of that balancing, time served is not

16  warranted.  Let me address it in this way, if I may.

17          Your Honor, usually when I stand before a district

18  court in a sentencing hearing I spend a great deal of my time

19  trying to convince the Court that the person they are

20  sentencing today is not the person who committed these crimes,

21  that there's been a transformation, admittedly helped perhaps

22  by incarceration.  He's found God.  He's found the tremendous

23  error in his ways due to drugs and criminal activity for

24  himself, for society, for his family, all of that.  He has a

25  new sense of commitment to the world, to himself, to his

1    family.  He's found God often and talks of his new faith and I

2    try and tell the Court don't be afraid of the sentence I'm

3    asking.  Don't be afraid because you're not sentencing the

4    same man or the same person who committed these crimes, and in

5    no way do I minimize the extent of his criminal activity nor

6    does Mr. Martinez, however, Your Honor, I don't need to do

7    that today because you're not sentencing the man before you as

8    someone who just had this revelation.

9            In 2003, Mr. Martinez, right after the birth of his

10   young daughter, his baby daughter, and particularly and

11   completely dismayed and horrified by the level of violence

12   that was happening now in the drug trade amid these cartels

13   told his wife, I'm going to walk away.  I need six or seven

14   months, I have to devise a plan or else I'm dead, but I will

15   walk away, I'm done.  In six, seven, eight months later he did

16   that.  Parenthetically, it should be noted in his career in

17   the cartel he never partook, sanctioned or was involved in any

18   way with violence.

19           So from 2003 he leads a crime-free life.  Still used

20   drugs, had a serious cocaine habit in 2003, however, when he

21   walks away, he tries to quit, he quits, manages to stay clean

22   until about 2005.

23           By 2008, he walks away completely from drugs and has

24   been completely clean to this day.  He found new meaning in

25   his life, partly because of faith.  He became a lay minister

1   in the Protestant faith and started doing many things in terms

2   of charities and for the poor, but also went into legitimate

3   businesses starting shortly after 2003 which continued until

4   the day of his arrest.  He has very successful and lucrative

5   businesses and I'm not naive to say at least the beginning

6   ones were not funded by illegal means, but there were many.

7   Car sales, he was part owner of one of the soccer teams down

8   there, clothing sales, an entrepreneur, this is a very bright

9   man.  I'm sure the Court could tell just from his testimony,

10  he could have done anything.

11          And since 2003, he did many things, kept making

12  money, providing for his family, now also providing for his

13  community including poor people and all legitimately.  Since

14  2008, no drugs.  His biggest sin was a, quote/unquote,

15  addiction to cockfighting every ones in a while, which I don't

16  believe is a federal crime.

17          THE COURT:  Actually I think it is, but --

18          MR. QUIJANO:  Okay, probably it is, but what isn't,

19  right.

20          I would submit, Your Honor, that he has provided

21  with what can only fairly be described as truly extraordinary

22  and historic substantial assistance.  Instrumental in the

23  conviction of the one the world's most notorious criminals.

24  Crippling two major cartels and for 17 years he has not been a

25  threat, he's not been a criminal, he's not been a drug user,

1    he's been a productive member of society.  I urge this Court

2    to let him return to his family and continue to be a

3    productive, compassionate member of society.

4           I see no value, Your Honor, to continue any further

5    imprisonment in light of all these 3553(a) factors.  And

6    again, perhaps even more than what I think is incredible

7    cooperation, is the last 17 years of his life that really

8    should speak to this Court more than anything else.

9           Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Quijano.

11          Mr. Martinez, if you have anything you'd like to say

12   I'm happy to hear from you.

13          (Defendant spoke in foreign language.)

14          THE COURT:  Thank you, Mr. Martinez.

15          Can I hear the translation please.

16          THE INTERPRETER:  Yes.

17          THE COURT:  I think I caught about 10 or 15 percent.

18          THE DEFENDANT:  Of course, Your Honor.

19          Your Honor, these words that I will say to you come

20   from my heart.  First, I ask my family for forgiveness for the

21   harm I caused them, for the errors that I made which led me to

22   be arrested.  I also ask this country's society for

23   forgiveness, the United States of America for the harm that I

24   have caused them with all the drugs that I distributed in this

25   country.  Believe you me, Your Honor, I am remorseful.  On

1    that same token I ask you for your forgiveness, Your Honor,

2    and I ask for forgiveness to all of the United States

3    Attorneys, the agents, all of the people who were working on

4    my case.

5            Your Honor, believe me my remorse is sincere so much

6    so that many years ago I had already changed my life.  I

7    stopped trafficking drugs, I got off that bad path and since

8    2007 or 2008 I stopped using drugs and alcohol and I started

9    working with a group called "Amore y Servicio," Love and

10   Service.  They are spiritual retreats.  They work with AA and

11   NA literature and the people who run that group have many

12   years of experience treating lots of other people who have

13   drug addiction problems, alcoholism, neurosis, emotional

14   disorders, they treat them with their testimonies and with

15   their testimonies they have helped to save lives.  That's

16   where I started since 2009 more or less until my arrest in

17   2014.  Before that I knew and had started repairing the harm

18   I'd done to society with all the drugs I had distributed and I

19   would like to, in the future, keep working on that path,

20   speaking to people who have that same illness alcoholism, drug

21   addiction and, again, I want to ask for forgiveness to all of

22   the American society especially all of the people negatively

23   affected by the drugs that I brought to this country, the

24   United States of America.

25            Lastly, I want to ask you, Your Honor, that today

1   you allow me to go home with my family.  Thank you very much

2   for listening to me.

3             THE COURT:  Okay.  Thank you.

4             I'll hear from the government.

5             MR. ROBOTTI:  Judge, I don't think the government

6   has much to add beyond the 5K letter here and what defense

7   counsel and the defendant have said except to highlight just a

8   few points briefly.

9             So I agree with the Court that the conduct is

10  severe.  This defendant imported 30 to 50 tons of cocaine into

11  the United States including 15 to 20 tons of cocaine right

12  here to New York City.  So he was a member of two of the most

13  violent criminal organizations in the world that committed

14  large-scale crimes.  But I would also point out that his

15  conduct since he has been apprehended and his cooperation has

16  been exemplary.  I do think that this is a difficult case for

17  the Court to balance on the one hand the severity of the

18  criminal conduct and on the other hand the significance of the

19  cooperation.  But in terms of cooperating witnesses that

20  appear before this Court, I would say that Mr. Martinez ranks

21  among the top echelon in terms of significance of cooperation

22  to the government, so I do think that the Court should weigh

23  that heavily, especially when considering in this case

24  Mr. Martinez acted and on behalf of -- in cooperating with the

25  government at tremendous personal risk to himself and to his

1    family members.  And I think as this Court knows through the

2    trial of Mr. Guzman Loera, that risk is real.  That is a

3    significant risk to his safety and to his family and despite

4    that risk, he willfully cooperated with the government, he has

5    done everything that the government has asked him to do during

6    the course of his cooperation.

7           To pick up on a couple of points that both the

8    defense counsel and the defendant made here about the man that

9    is appearing before the Court today, I do think the government

10   would note throughout this process it took note of

11   Mr. Martinez's diligence and hard work and focus when during

12   the meetings with the government how committed he was to this

13   process.  You know, there are some cooperating witnesses who

14   show up to these meetings and just aren't focused and the

15   government has to work with them to help make sure that they

16   get focused throughout this process and are really trying

17   diligently to cooperate.  Mr. Martinez was not that type of

18   cooperator.  He walked in every day prepared and was ready to

19   work.  He didn't want to take breaks, he didn't want to stop,

20   he was focused to make sure that he was providing as much

21   assistance as he could the government.

22           In terms of whether he's turned his life around, you

23   know, you never know what's going to happen when somebody gets

24   out of jail, but Mr. Martinez did say to the government

25   repeatedly throughout this process that he wanted to leave his

1   life of crime behind, he had left his life of crime behind and

2   that when he gets out he wants to be a contributing member to

3   society and that was something that he emphasized from the

4   very first day that we sat down with him all the way up until

5   the last meeting that we had with him just a few minutes ago.

6   So I do think that based on everything he says he is committed

7   to moving forward and being a contributing member of society.

8           So I think the takeaway here, Judge, from the

9   government's perspective is yes, these are among the worse

10  crimes that we see in this courthouse in terms of drug

11  trafficking, but his cooperation is equally as important from

12  the government's perspective in terms of what he's offered

13  here --

14          THE COURT:  Equally.

15          MR. ROBOTTI:  I think equally, Your Honor --

16          THE COURT:  Think about the implications of what you

17  just said and tell me that you meant it, okay.  What you're

18  really saying is that as bad as the conduct was, it is

19  entirely offset by the high value cooperation.  That's what

20  equally means.  Is that what you mean?

21          MR. ROBOTTI:  Your Honor, what I would say is that

22  his cooperation was exemplary and his cooperation should weigh

23  heavily in the Court's consideration here against his criminal

24  conduct.

25          THE COURT:  Okay, but that's obvious, right?

1          MR. ROBOTTI:  Yes, Judge.

2          THE COURT:  Okay.  Let me ask probation, I believe

3    he was arrested in Mexico in 2014 and extradited in 2016.  Is

4    he going to get credit from the BOP for the time spent being

5    held in Mexico?

6          THE PROBATION OFFICER:  Thank you, Your Honor.

7    Typically the Probation Department is obligated to defer to

8    the Bureau of Prisons for determining the time computation and

9    the credit a defendant will receive for time served.

10          There are a few factors that come into play here.

11    The first one is that he was arrested in Mexico.  The first

12    question the BOP will have was whether or not the arrest in

13    Mexico stemmed from the instant offense or if he was charged,

14    for example, with a drug offense in that country.  That's an

15    assessment the Probation Department cannot make at this time

16    as I do not know how the case arose in the foreign country and

17    whether or not the initial arrest in that foreign country was

18    connected to the instant case.

19          THE COURT:  Let me just interrupt you there for a

20    minute.  I think the lawyers know, right, what he was arrested

21    for in Mexico?

22          MR. ROBOTTI:  My understanding, Your Honor, is he

23    was arrested at the request of the United States on the

24    government's provisional arrest warrant and that the

25    extradition proceedings took about a year and a half until he

1    was actually extradited to the United States.

2                THE COURT:  So he was arrested on the request that

3    means in connection with the charged crimes here.

4                MR. ROBOTTI:  That's correct, Your Honor.

5                THE COURT:  So let me ask probation to assume that's

6    the case, he was arrested at the request of the United States

7    for the charged conduct in the United States.

8                THE PROBATION OFFICER:  The BOP has -- has a way of

9    determining what the effective date that their time in custody

10   begins.  So the bottom line is that he may, keyword being may,

11   end up receiving credit for the time he went into custody in

12   that foreign country.

13               THE COURT:  Why wouldn't he?  Do you have an answer?

14               THE PROBATION OFFICER:  No, honestly, the BOP would

15   need to be contacted to make that determination as to when the

16   clock would start ticking, but there is a "may" here, there's

17   still a may.  If it -- if it does -- if the extradition is

18   tied to the instant charges, there's still a caveat of there

19   being may.  There may be all of the time counted that was

20   spent during his incarceration in the foreign country, or

21   there may be a portion, but typically we are obligated to

22   defer to the BOP because they are -- they are the ones who are

23   assessing and determining the effective date of imprisonment.

24               THE COURT:  I'm not questioning your need to defer,

25   I understand it's the BOP's determination not probation's

1    determination, I'm simply asking based on your experience with

2    the BOP is it likely that, in fact, they will give him credit

3    for an arrest that occurred at the behest of the United States

4    based on the charges that had been issued in the United

5    States.

6              THE PROBATION OFFICER:  That I cannot answer, Your

7    Honor.

8              THE COURT:  Okay.  Thank you.  Do you have a view,

9    Mr. Quijano.

10             MR. QUIJANO:  Yes, Your Honor.  In Title 18, the

11   section escapes me, I think it's 35 or 38 something.  There is

12   a section that deals with the computation of time and my

13   reading of that section is that BOP will start calculating as

14   of the date that a BOP facility receives the inmate.  It comes

15   up a lot in 5G1.3 types of calculations when there is relevant

16   conduct involved, the person has been serving time perhaps in

17   a state before he's indicted and brought to federal court.

18   And as the Court knows, under those circumstances, since BOP

19   will not give credit for that relevant conduct time in state

20   prison, the Court is asked to, in its judgment, subtract the

21   amount of time that they've done from whatever sentence is

22   actually imposed and BOP will calculate from that point in

23   time.

24             THE COURT:  But how are we possibly dealing with

25   that here when we're not talking about relevant conduct, we're

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

1    talking about an arrest that occurred for the charged conduct

2    at the request of the United States.

3         MR. QUIJANO:  And what I'm suggesting, Your Honor,

4    is if the Court just imposes the sentence, BOP will calculate

5    only from the point in time that they had him in a BOP

6    facility.  They will not consider or calculate time that he

7    spent in detention for these charges in Mexico.

8         THE COURT:  Even if I'm telling them that I'm

9    assuming they will count that time, you're saying they won't

10   observe my recommendations.

11        MR. QUIJANO:  I've had it before in 5G situations

12   and the problem is they won't.  The short answer is no, they

13   won't.  The only way around that is 5G1.3 contemplation which

14   is where the Court announces the sentence and then subtracts

15   the amount of time.  Of course, all this could be settled with

16   just a time served sentence I might add.

17        THE COURT:  Yes, I understand that.  Okay.

18        THE PROBATION OFFICER:  Your Honor, if I may add to

19   my comments, I've been checking with my colleagues in the

20   office and it seems as if the BOP, although they cannot

21   guarantee the amount of time he will receive credit for that

22   was spent in a foreign country, he should get some credit.  So

23   it's not a definitive answer but it is likely that he should

24   get some credit.  Since the first question is basically

25   answered that the arrest is linked to the instant case, there

1    should be some credit received.

2            THE COURT:  But again, I'm not understanding why

3    there would be anything less than complete credit except

4    Mr. Quijano says it's just not done and it is up to me to

5    reduce the sentence not the BOP because they rely on me

6    essentially to give whatever credit I think is due.  That's

7    what he's saying.

8            MR. QUIJANO:  And they rely on the statute though,

9    at least that's the explanation I've gotten from them.

10           THE COURT:  Yes.

11           MR. QUIJANO:  They'll rely on the statute.

12           THE COURT:  Does the government have any information

13   on this issue?

14           MR. ROBOTTI:  No, Your Honor.  Unfortunately, we

15   typically defer to the BOP in the calculation here and that,

16   you know, thinking it can be a rather complicated process, so

17   I don't want to speak for the BOP.

18           THE COURT:  Well, Mr. Quijano is telling me the only

19   definite answer to the question I've asked, it's an important

20   question, I'm a little bit surprised that neither the

21   government nor probation has nailed this down because of the

22   importance of the question, but I'm going to go with

23   Mr. Quijano's explanation because it's the most definite and

24   clear disposition that I have on that issue.  So where does

25   that leave me?

1              All right, I've considered all of the factors under

2    3553(a).  The guidelines here, it seems to me, are not all

3    that important because, as I suggested to Mr. Quijano, if

4    there were not the mitigating factors that he has identified,

5    we would definitely be talking about a life sentence if there

6    were no other countervailing factors and even if there were no

7    guidelines, that's what we'd be talking about.  There are very

8    important mitigating factors here.  I agree with everything

9    Mr. Quijano and the government have said with respect to the

10   application of 5K1 in this situation.  I have never had a

11   defendant who has put himself at greater risk than this

12   defendant has.  I may sometime in the future, but I haven't

13   had it yet.  It was -- I mean I want to say it was

14   extraordinarily brave, I think it was.  I also think there was

15   some element of necessity to it because the defendant knew he

16   had to get out of this business, he just had to.  They weren't

17   happy with him and not being happy with somebody leads to one

18   exit strategy when you're in this business.  Nevertheless,

19   what he did was not just admit his guilt, he came forward and

20   took on a role that put him at the highest possible risk he

21   could be at.

22              By the same token, the value of his cooperation, I

23   just can't imagine how it could have been greater, it was

24   truly extraordinary in every sense of the word and it was of

25   the highest value to the government.  You know, there's two

1   aspects to 5K1, how hard does the defendant try, and how much

2   does it really help when he gives his information.  Here he

3   gets the highest possible evaluation on both of those factors.

4   He gave it everything he had and he had extraordinarily

5   valuable information that's in addition to the risk that I've

6   said I understand he took.  Of course, I have to recognize at

7   the same time that one of the reasons that the value of his

8   cooperation was so high is because his position in the

9   organization was so high.  I accept that he was not a

10  participant in the extraordinary violence perpetuated by this

11  criminal organization, two criminal organizations, but he was

12  what I call a senior executive.  I don't think he can be

13  classified as a middle manager in the scope of this operation

14  and I think Mr. Martinez said it right, more than Mr. Quijano,

15  when he talked about apologizing to the victims of the crime,

16  not the people who were killed by other members of the

17  cartels, but the people who consumed this massive amount of

18  drugs to their detriment.  You know, I have no evidence in

19  front of me to suggest that anyone died sort as a result of

20  the drugs that he arranged the shipping for, on the other

21  hand, common sense suggests with this quantity the ill effects

22  on the recipients of the drugs were very high.

23          I also accept what Mr. Martinez and Mr. Quijano have

24  told me about the defendant being a changed person.  I think

25  Mr. Quijano's right, this isn't the situation where I kind of

1   have to take it on faith.  It's been a long time since he's

2   been out of the business doing other socially beneficial

3   things, so I'm not -- as the government suggested you never

4   know a hundred percent, but I'm not terribly concerned about

5   recidivism here or the defendant sliding back into his old

6   ways.  He has proven to me already that he is the person that

7   he represents himself as.  So I accept that and that of course

8   is very important in terms of specific deterrents.

9           So that leaves me with the conundrum that I started

10  out with here, which is, considering the awful nature of his

11  crime, is there any level of reconstitution as a person and

12  cooperation to show that reconstitution that can, as

13  Mr. Robotti said, equal the crime.  If it's equal or even if

14  it's not equal, if it's equal when you add in the time he's

15  been in custody already, then it's obviously a time-served

16  sentence.  If there's a disparity, then I have to impose some

17  additional time to equal that disparity.

18          THE PROBATION OFFICER:  Your Honor, I'm sorry to

19  interrupt.

20          THE COURT:  That's okay, go ahead.

21          THE PROBATION OFFICER:  I just received word from

22  one of our supervisors who is formerly employed at the Bureau

23  of Prisons and he's the expert we all go to and he relayed

24  that if the defendant served time in a Mexican prison on a

25  U.S. warrant pending extradition for prosecution of the

1    instant offense, then he will get credit for that time.  If

2    any of the time spent in a Mexican prison was prior to the

3    U.S. warrant, then he will not get credit for it.  So this is

4    where we're at in my research on the issue.

5         THE COURT:  Okay.  Mr. Robotti, he was arrested in

6    Mexico pursuant to an extradition warrant, right?

7         MR. ROBOTTI:  Yes, Your Honor.  My understanding,

8    and defense counsel or defendant can correct me if they know

9    otherwise, my understanding is he was arrested based on a

10   request from the United States pursuant to a provisional

11   arrest warrant.

12        THE COURT:  There is a request and there is a

13   warrant.  I can see the BOP being very technical about this.

14   Was there a physical warrant delivered to the Mexican

15   government or do the papers take some other form by way of the

16   extradition request?

17        MR. ROBOTTI:  Your Honor, the government requests

18   the Mexican government to issue a provisional arrest warrant

19   for the defendant based on the United States charges.  The

20   only complication I could see here is whether the defendant

21   had any outstanding charges in Mexico at the time for which he

22   was also serving prison time.  I don't actually know the

23   answer to that.  I don't know if Mr. Quijano --

24        MR. QUIJANO:  No, Your Honor, he didn't.  However,

25   from personal experience in dealing with this issue with the

1      BOP, I'm constantly referred back to that statute and when

2      they start calculating the release date they are going to

3      calculate from the moment BOP had him.  I understand what

4      probation is saying, but --

5                THE COURT:  Have any of your prior cases, because

6      none of mine have, involved a situation where the arrest is

7      wholly at the request of the United States.  I usually see,

8      you know, like you're describing there's an arrest on local

9      law violations and then there is a request for extradition,

10     and then we'd have that problem.

11               MR. QUIJANO:  I believe I've had it with Columbian

12     cases where we've dealt with it, at least at this point, we've

13     dealt with it in terms of a downward departure.  Again, under

14     the belief that BOP will not calculate the time spent in the

15     Colombian prison, so we addressed it as a downward departure.

16               THE COURT:  Okay.

17               MR. QUIJANO:  I usually haven't been asking for time

18     served in those situations parenthetically.

19               THE COURT:  Right.  Look, I understand the good

20     reasons why the government cannot advocate for a particular

21     sentence, that's fine.  I'm not asking that.  But for future

22     reference, okay, I think probation and the government have the

23     obligation to nail this issue down.  Someone at the BOP can

24     say, I'm not binding myself, but he's going to get credit or

25     he's not going to get credit.  There is nothing in my

1    documentation, and I have extensive documentation, to suggest

2    that he was arrested for any local law violations but I don't

3    know how significant that is.  Probation now tells me that

4    she's communicating by text with her office that oh, well, if

5    there really isn't any local law violation, then he should get

6    credit.  But, you know, I'm dealing with a man's freedom here,

7    I can't take chances on it.  I've got to defer it to

8    Mr. Quijano's experience because the government and probation

9    haven't given me anything different, you know, so I'm just

10   saying next time I would expect this to be nailed down.  I'm

11   not going to keep the sword of Damocles hanging over this

12   defendant by adjourning now so that we can find out.  I'm

13   simply going to give him the benefit of the doubt.

14           If I give him the benefit of the doubt that means he

15   gets credit for roughly six years of custody and the question

16   becomes whether six years of custody is sufficient to offset

17   the damage that was caused by the crime itself.  And that

18   takes into account, has to take into account cooperation, the

19   personal transformation that he's undergone, the beneficial

20   things that he has attempted to do.  And I think there are

21   some crimes that are just so bad that even if everything

22   humanly possible is done to make amends, and I accept that

23   this defendant has done everything humanly possible, six years

24   is not to me sufficient.  Then I get to the question of well,

25   what is.  Obviously, if I were going to say well, seven years

1    I would say that's a ridiculous distinction, the six years is

2    enough.  So the real question is, is there an amount in

3    addition to the six years he's served that will serve to

4    offset the harm that has been done and at the same time make

5    it clear that the best thing for anybody to do in his position

6    is to do what he did, become a new person, cooperate fully.

7            The lowest I can go, recognizing that I have to

8    impose the least amount of time that I can to accomplish all

9    the purposes of sentencing, is nine years and that would be 98

10   months, if I'm counting correctly.  Ninety-two -- what is that

11   12 times nine, 90 and 18, 108.  I'm going to deduct from that,

12   because Mr. Quijano has the best indication to me of what BOP

13   is likely to do, the two years that he served, so that reduces

14   us down to 84 months.

15           Am I counting right, someone checking me?

16           MR. ROBOTTI:  Yes, Your Honor.

17           THE PROBATION OFFICER:  Yes.

18           THE COURT:  I am therefore going to impose a

19   sentence, I will say a very difficult sentence, on Count Three

20   of 84 months.  I will follow that with two years of supervised

21   release.  The supervised release will have the following

22   special conditions:

23           Number one, no association with any members of a

24   criminal enterprise or anyone known to have a criminal record.

25   No visiting of any place that he knows or should know

1  reasonably is a place frequented by people with criminal

2  records.

3          If he is removed from the United States after he

4  serves the sentence, the special condition will be that he not

5  reenter the country illegally.  He's got to cooperate with all

6  directions from immigration authorities.

7          I'm not going to impose a fine because I don't think

8  he can afford it.  I will impose the mandatory 100-dollar

9  special assessment.

10          The way I've done this -- if you're wrong,

11  Mr. Quijano, it may well come out to a time served sentence if

12  they give him the extra credit that I've already given him,

13  I'm not terribly troubled by that.  I think that's the

14  situation that the government and probation have left me in.

15  I just can't take a chance that I'm sentencing him to two

16  years more than I think is required.

17          All right, are there open counts?

18          MR. ROBOTTI:  Yes, Your Honor, Counts One and Two

19  are open, the government moves to dismiss.

20          THE COURT:  That motion is granted.

21          Anything further before I advise him of his

22  appellate rights?

23          MR. QUIJANO:  I'm sorry, Your Honor.

24          THE COURT:  Yes.

25          MR. QUIJANO:  Just to be clear, the final sentence

1    is 84 months.

2              THE COURT:  Eighty-four months.

3              MR. ROBOTTI:  Your Honor, the government just asks

4    that the Court orally pronounce the forfeiture order on the

5    record and attach that to the judgment.

6              THE COURT:  Right.  I have previously entered a

7    forfeiture order on this, or if I haven't I will sign it now,

8    that will be annexed to the judgment.  Compliance with that

9    forfeiture order is part of the special conditions of

10   supervised release and part of the judgment of the Court.  All

11   right.

12             Mr. Martinez, you have the right to appeal the

13   sentence that I've just imposed, I'm not saying you want to

14   but if you do want to you certainly have that right.  In order

15   to appeal the sentence the most important thing you need to do

16   is get filed what's known as a Notice of Appeal.  That's a

17   one-page piece of paper that says you are appealing.

18   Mr. Quijano will file that for you.  If he doesn't for some

19   reason, you can certify to the clerk that you can't afford a

20   lawyer and the Clerk of the Court will file it for you or you

21   can get a one-page piece of paper, the form of it and file it

22   yourself, but however you delegate it, you have to make sure

23   it's your responsibility to see to it that it gets filed

24   within 14 days or you will not have any right to appeal the

25   sentence.

1                    Is there anything further?

2                    MR. ROBOTTI:  Nothing from the government, Judge.

3                    MR. QUIJANO:  No, Your Honor.

4                    THE COURT:  All right.  Thank you all very much.  We

5      are adjourned.

6                    (Matter concluded.)

7

8                              *      *      *      *      *

9

10     I certify that the foregoing is a correct transcript from the
       record of proceedings in the above-entitled matter.

11

12     s/ Georgette K. Betts                 March 17, 2020

13     GEORGETTE K. BETTS                    DATE

14

15

16

17

18

19

20

21

22

23

24

25